# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | 1:23CR297-1 |
| | ) | |
| RANDY EARL BETHEA, JR. | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

LORETTA C. BIGGS, District Judge.

Before the Court is Defendant Randy Earl Bethea, Jr.'s Motion to Suppress. (ECF No. 13.) Defendant filed this motion on September 18, 2023, (ECF No. 13), which came on for hearing on October 2, 2023, (ECF No. 17). Defendant argues that a High Point Police Department Detective's investigative "stop and seizure of . . . Defendant violated the Fourth Amendment because [the Detective] did not have a reasonable, articulable and particularized suspicion that [Defendant] had committed, was committing or was about to commit a crime." (ECF No. 13 at 11.) Defendant moves "to suppress the American Tactical .223 caliber rifle, magazine and .223 caliber ammunition seized from him by High Point Police officers on April 22, 2023, on the grounds that they were seized in violation of the Fourth Amendment to the United States Constitution." (*Id.* at 1.) For the reasons stated herein, the motion will be denied.

**I.   FINDINGS OF FACT**

This case involves events surrounding a stop of Defendant by Detective James Manzo ("Detective Manzo") of the High Point Police Department. On the morning of April 22, 2023, at approximately 6:55 AM, while heading to work, Detective Manzo was driving on East

1

Green Drive in High Point, North Carolina, when he passed a residence on the 1600 block of East Green Drive. (Tr. 2:21–3:6.[1]) Detective Manzo had responded to multiple calls in the area and was familiar with the residence, as the High Point Police Department assisted the United States Marshal's Fugitive Task Force with the arrest of an individual for a violent felony at that residence earlier that year. (Tr. 3:24–4:11.)

Detective Manzo noticed a man, Defendant, exiting the driveway of the residence about to walk across Green Drive, carrying what he described as a "large long looking black object" that Detective Manzo thought could be some type of long firearm. (Tr. 3:1-11.) After having passed Defendant and watching him in his rearview mirror, Detective Manzo noticed that Defendant was "swaying back and forth and [was] unsteady on his feet." (Tr. 4:16-20.) Detective Manzo executed a U-turn, after which he saw Defendant now walking south on Wesley Drive. (Tr. 3:11-15.) Detective Manzo observed that Defendant was still "unsteady on his feet, swaying back and forth, and . . . was looking over both shoulders" constantly, in a "paranoid" manner. (Tr. 5:12-14.) Detective Manzo turned his vehicle around again and briefly continued on his route to work; however, he then decided that he should turn around to locate and observe Defendant once more. (Tr. 5:22–6:3.)

After having circled around again and located Defendant, Detective Manzo parked his car on Russell Street and observed Defendant walking southbound on Arch Street, which was adjacent to Russell Street. (Tr. 7:17–8:10, 10:2-4.) It was at this point that Detective Manzo was able to confirm that Defendant was "carrying a black rifle in both hands." (Tr. 8:25–9:3.)

---

[1] Citations are to the Realtime Feed – Unedited/Uncertified Transcript for the October 2, 2023, Criminal Session before this Court ("Tr.").

Detective Manzo observed Defendant carrying the rifle in a "low-ready" position, with his right hand on the pistol grip near the trigger mechanism and his left hand on the front of the foregrip of the rifle. (Tr. 9:4-13.) Detective Manzo testified that someone who holds a firearm in a low-ready position is "potentially ready to use" that firearm, and that the position allows for a "quick draw" to be able to aim the firearm and discharge it. (Tr. 9:14-17.)

Once Detective Manzo confirmed that Defendant was carrying a firearm and observed him carrying it in a low-ready position, he pulled his vehicle onto the corner of Russell Street and Arch Street, emerged from the vehicle with his firearm drawn, and ordered Defendant to drop his gun. (Tr. 9:23–10:4.) Detective Manzo testified that he drew his firearm in order to conduct an investigative stop concerning who Defendant was and what was going on regarding the acts and demeanor of Defendant that Detective Manzo had earlier witnessed. (Tr. 10:5-12.) Defendant complied, placing the rifle on the grass next to the road. (Def. Ex. 1 at 2.) As he approached Defendant, Detective Manzo smelled an odor of alcohol on Defendant's person. (Tr. 10:19-21.) Detective Manzo detained Defendant "in handcuffs without incident." (Def. Ex. 1 at 2.)

After having communicated to other officers via radio about what was transpiring, a Detective Dorville was the first officer to arrive on the scene. (Tr. 11:6-8.) Upon Detective Dorville's arrival, Detective Manzo communicated "1056" to Detective Dorville, which notified Detective Dorville that Defendant was an impaired person. (Tr. 11:1-15, 14:23–15:2.) Detective Dorville drove around Detective Manzo and to the rifle that was laying on the grass along Arch Street. (Tr. 11:9-11.) Detective Dorville secured the rifle, confirmed that it was real, and collected the firearm. (Def. Ex. 1 at 2.) Detective Manzo then began questioning

3

Defendant. (Def. Ex. 1 at 2.) In response to initial questions from Detective Manzo, Defendant either slurred his words or only answered with a blank stare. (Tr. 11:15-20.) Detective Manzo first asked why Defendant was carrying a rifle. (Def. Ex. 1 at 2.) Defendant responded in a slurred manner that he was taking the rifle home. (*Id.*)

Detective Manzo then asked questions in an attempt "to obtain [Defendant's] information," (*id.*), asking what Defendant's name was and where Defendant lived, (Tr. 27:5-8). When asked what his name was, Defendant responded by saying "I want a lawyer." (Def. Ex. 1 at 2; Tr. 27:10-16.) Detective Manzo continued questioning Defendant in order to have Defendant identify himself and allow Detective Manzo to determine whether or not he was a felon, (Tr. 16:5-7, 27:17-22), as Detective Manzo was interested in whether Defendant was a felon prohibited from possessing a gun, (Tr. 28:10-13). After Detective Manzo inquired more about Defendant's name, Defendant eventually responded that his name was "Randy Randy." (Def. Ex. 1 at 2.) Defendant consented to a search of his person, and no illegal contraband or identification was found. (*Id.*)

In addition, the Government presented as evidence Detective Manzo's body-worn camera footage demonstrating the interaction that took place after Detective Manzo initially stopped Defendant. (*See* Tr. 12:17–16:13; *see* Gov. Ex. 2.) Upon viewing this footage, the Court found that Defendant appeared "very impaired" and seemed as though he did not understand what Detective Manzo was saying to him, confirming Detective Manzo's assessment of Defendant's condition. (Tr. 43:10-17.)

Defendant was placed under arrest for resisting, delaying, or obstructing a public officer due to his failure to identify himself. (Tr. 15:24–16:4, 27:2-6.). The rifle was later

4

determined to be an American Tactical Omni hybrid .223 caliber rifle loaded with 13 rounds of PMC .223 ammunition in the magazine and one round of Brown Bear .223 ammunition in the chamber. (Def. Ex. 1 at 3.) Also, after a records check of Defendant was conducted during the booking process, it was revealed that Defendant was a convicted felon. (*Id.*) Defendant was ultimately charged with one count of possession of a firearm by a felon and one count of resisting, delaying, or obstructing a public officer in violation of N.C. Gen. Stat. § 14-223. (*Id.*) Defendant was indicted in this Court for the felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(8). (ECF No. 1.)

## II. DISCUSSION (ANALYSIS AND CONCLUSIONS OF LAW)

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV; *see Mapp v. Ohio*, 367 U.S. 643, 655 (1961) (holding that the Fourth Amendment is incorporated and applied to the states by the Due Process Clause of the Fourteenth Amendment). Evidence gathered as fruit of an unreasonable search or seizure is generally inadmissible against a defendant. *See Taylor v. Alabama*, 457 U.S. 687, 694 (1982); *Wong Sun v. United States*, 371 U.S. 471, 484–86 (1963).

In his Motion to Suppress, Defendant argues that Detective Manzo's initial seizure of Defendant "was not based on the required reasonable, articulable, and particularized suspicion." (ECF No. 13 at 6.) Defendant argues that Detective Manzo's statements in his report that the area is known as a "high drug, high crime area," that a female assault suspect had been arrested approximately six months earlier at the address where Detective Manzo first saw Defendant, that Defendant appeared unsteady on his feet while walking, and that

5

Defendant was continually looking left and right over his shoulders all failed to justify the stop of Defendant. (*Id.* at 9–10.)  Defendant further contends that North Carolina is an open carry state that makes it lawful to carry a firearm in plain sight in public and, in reliance on *United States v. Black*, 707 F.3d 531 (4th Cir. 2013), argues that the mere fact that Defendant was carrying the rifle, without more, cannot justify an investigatory detention. (ECF No. 13 at 7–9.)

In response, the Government argues that Defendant's Motion to Suppress should be denied because "Detective Manzo had reasonable suspicion under *Terry* to conduct an investigatory stop" of Defendant.  (ECF No. 14 at 10.)  The Government contends that the facts here support the reasonableness of Detective Manzo's decision to conduct an investigatory stop of Defendant. (*Id.* at 4, 7.)  By the time Detective Manzo stopped Defendant, Detective Manzo had seen Defendant walking unsteadily and swaying back and forth, observed that Defendant was armed with a rifle in a "low[-]ready" position, and observed Defendant looking all around while walking.  (*Id.* at 7–8.)  According to the Government's argument, all of this contributed to the existence of reasonable suspicion of criminal activity, including the offenses of "Going Armed to the Terror," which is prohibited by North Carolina common law, and "Intoxicated and disruptive in public," which is prohibited by N.C. Gen. Stat. § 14-444.  (*Id.* at 8–9.)  Finally, the Government points out that *United States v. Black*, argued as support by Defendant, is distinguishable from the facts in this case due to the manner in which Defendant was carrying his firearm, at a "low[-]ready" position with both hands.  (*Id.* at 9.)

### a. Reasonable Suspicion

A brief, non-consensual detention is lawful only if supported by reasonable suspicion. *United States v. Jones*, 678 F.3d 293, 299 (4th Cir. 2012) (citing *Florida v. Bostick*, 501 U.S. 429, 434 (1991)). Reasonable suspicion requires "a particularized and objective basis for suspecting the person stopped of criminal activity." *United States v. Smith*, 396 F.3d 579, 583 (4th Cir. 2005) (quoting *Ornelas v. United States*, 517 U.S. 690, 696 (1996)). "In determining whether a detention is supported by reasonable suspicion, we look to the circumstances known to the officer and 'the specific reasonable inferences which he is entitled to draw from the facts in light of his experience.'" *Id.* (quoting *Terry v. Ohio*, 392 U.S. 1, 27 (1968)). In so doing, the court must consider "the totality of the circumstances—the whole picture." *Id.* (quoting *United States v. Cortez*, 449 U.S. 411, 417 (1981)). Courts have recognized a number of factors that may contribute to reasonable suspicion, including unprovoked flight from police, *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000), presence in a high crime area, *United States v. Johnson*, 599 F.3d 339, 345 (4th Cir. 2010), evasive conduct, *Smith*, 396 F.3d at 584, observation by law enforcement of what appears to be a drug transaction or other criminal conduct based on their experience, *Adams v. Williams*, 407 U.S. 143, 145 (1972) (citing *Terry*, 392 U.S. at 22–23), and furtive behavior, *United States v. Sims*, 296 F.3d 284, 286–87 (4th Cir. 2002). Reasonable suspicion may exist even when relevant conduct also has an "innocent explanation." *Wardlow*, 528 U.S. at 125.

A seizure occurs when an officer, "by means of physical force or show of authority, has in some way restrained the liberty" of the defendant. *Jones*, 678 F.3d at 299 (quoting *Terry*, 392 U.S. at 19 n.16). Absent physical force, a seizure requires assertion of authority and

"*submission* to the assertion of authority." *United States v. Brown*, 401 F.3d 588, 594 (4th Cir. 2005) (quoting *California v. Hodari D.*, 499 U.S. 621, 626 (1991)). An act constitutes a show of authority if a reasonable person would not "feel free 'to disregard the police and go about his business.'" *Id.* at 593 (quoting *Bostick*, 501 U.S. at 434). This objective inquiry requires consideration of "[a] number of circumstances, . . . including 'the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled.'" *Id.* (quoting *United States v. Mendenhall*, 446 U.S. 544, 554 (1980) (opinion of Stewart, J.)).

Here, Detective Manzo asserted his authority over Defendant when he parked his police vehicle and emerged from the vehicle with his weapon drawn and pointed at Defendant. (Tr. 9:23–10:4.) After Detective Manzo ordered Defendant to drop his gun, Defendant immediately complied, placing the rifle he was carrying in the grass adjacent to the road. (Def. Ex. 1 at 2.) Thus, the Court finds that Detective Manzo's act of pointing his firearm at Defendant and ordering him to drop the rifle constituted a seizure.

At the time the seizure occurred, the circumstances and pieces of information from which Detective Manzo could develop reasonable suspicion were copious. First, upon initially passing the residence at the 1600 block of East Green Drive, Detective Manzo observed Defendant exiting the driveway of the residence carrying a "large long looking black object" that Detective Manzo thought could be some type of long firearm. (Tr. 3:1-11.) Second, Detective Manzo had responded to multiple calls for service in the area where that residence was located and knew the residence to be associated with past crime, as the High Point Police

8

Department helped to arrest an individual for a violent felony there earlier that year. (Tr. 3:24–4:11); *see United States v. Black*, 525 F.3d 359, 365–66 (4th Cir. 2008) (finding that a defendant's location in a high crime area, combined with other enumerated factors, constituted reasonable suspicion to detain and frisk a defendant); *United States v. Mayo*, 361 F.3d 802, 804–07 (4th Cir. 2004) (holding that a defendant's location in a high crime area, combined with suspicious and nervous conduct, constituted reasonable suspicion and justified an officer's protective frisk); Third, he noticed that Defendant was walking unsteadily and swaying back and forth. (Tr. 4:16-20, 5:9-14.). Fourth, Detective Manzo observed that Defendant was constantly looking over both his shoulders in a paranoid manner. (Tr. 5:12-14.) Finally, he confirmed that the black object that Defendant was holding was a black rifle and saw that Defendant was holding the rifle in a low-ready position. (Tr. 9:2-17.)

The Court finds that the totality of these circumstances gave Detective Manzo a reasonable suspicion of criminal activity by Defendant to support an investigatory stop. Defendant's behavior would undoubtedly raise concern about the safety of the community and about Defendant's own well-being. Furthermore, the circumstances known to Detective Manzo and "the specific reasonable inferences which he is entitled to draw from the facts in light of his experience" support reasonable suspicion. *Smith*, 396 F.3d at 583 (quoting *Terry*, 392 U.S. at 27).

Moreover, the Court finds that the circumstances of this case are distinguishable from those in *United States v. Black*, the case Defendant attempts to use to support his argument that the sole fact that Defendant was carrying a firearm did not justify Detective Manzo's detention of Defendant, as such an act is legal in North Carolina. In *Black*, the Fourth Circuit held that

since the "state permits individuals to openly carry firearms, the exercise of this right, without more, [could not] justify" an officer's detention of a defendant for simply possessing and displaying a firearm. 707 F.3d at 540. However, the defendant in *Black* was carrying a firearm in a holster on his hip, which was found to be a lawful way to display and possess the firearm. *Id.* Here, by contrast, Defendant's firearm was far from being holstered on his hip. Defendant was grasping the assault rifle using both hands in a low-ready position, as if he was prepared to shoot. Therefore, *Black* is not analogous as there are stark distinctions between how the firearm was being carried in *Black*, holstered on Black's hip, and in this case, where Defendant was holding the firearm in a low-ready position while appearing intoxicated and walking in a paranoid fashion. In the totality of the circumstances, Detective Manzo's observations of Defendant and how he was carrying the rifle support the reasonable suspicion that he developed, notwithstanding North Carolina's status as an open carry state.

Accordingly, the Court finds that Detective Manzo's reasonable suspicion was supported by the totality of the circumstances witnessed by Detective Manzo prior to Defendant being stopped and, therefore, the investigatory detention of Defendant was lawful under the Fourth Amendment. Worthy of further discussion, however, is whether Detective Manzo violated Defendant's *Miranda* rights by continuing to question Defendant after Defendant requested an attorney. The Court next considers this issue.

### b. Defendant's Assertion of His Right to Counsel

The Fifth Amendment guarantees U.S. citizens a privilege against self-incrimination. *See* U.S. Const. amend. V. The issuance of the four *Miranda* warnings of constitutional rights is required when a subject is interrogated while in custody. *Miranda v. Arizona*, 384 U.S. 436,

10

Case 1:23-cr-00297-UA   Document 18   Filed 10/09/23   Page 10 of 14

478–79 (1966) ("[A]n individual . . . taken into custody . . . must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires."). Statements obtained without the delivery of such warnings are obtained in violation of the Fifth Amendment and inadmissible as evidence against a defendant. *See id.* "[T]he Fifth Amendment's Self-Incrimination Clause is incorporated in the Due Process Clause of the Fourteenth Amendment and thus applies to the States." *Dickerson v. United States*, 530 U.S. 428, 434 (2000) (citing *Malloy v. Hogan*, 378 U.S. 1, 6–11 (1964)).

However, "*Miranda* warnings are not required when a person is questioned during a routine traffic stop or stop pursuant to [*Terry*]." *United States v. Leshuk*, 65 F.3d 1105, 1108–09 (4th Cir. 1995) (citing *Berkemer v. McCarty*, 468 U.S. 420, 437–42 (1984)). Further, recognized as the "booking exception" to *Miranda*, *see Pennsylvania v. Muniz*, 496 U.S. 582, 601–02 (1990), "the taking of basic personal information such as name, age, and place of birth" does not constitute "interrogation" for purposes of *Miranda*, *United States v. Taylor*, 799 F.2d 126, 128 (4th Cir. 1986). Though these exemptions to the application of *Miranda* do exist, the Supreme Court has found that statements made during the "functional equivalent" of a custodial interrogation still do require *Miranda* warnings. *Rhode Island v. Innis*, 446 U.S. 291, 300–01, (1980). For a law enforcement officer's statements, questions, or actions to be the functional equivalent of custodial interrogation, in addition to the person not being free to leave, the officer "should know" that his statements, questions, or actions "are reasonably likely to elicit an incriminating response from the suspect." *Id.* at 301. These *Miranda* safeguards come into

11

play even in the context of the booking exception, as the Supreme Court has also recognized that "the police may not ask questions, even during booking, that are designed to elicit incriminatory admissions." *Muniz*, 496 U.S. at 602 n.14.

After Defendant was seized and Detective Manzo asked Defendant for his name, before responding with his name, Defendant said, "I want a lawyer." (Tr. 27:10-16.) However, Detective Manzo continued questioning Defendant in an attempt to identify him, for purposes of determining whether Defendant was a felon. (Tr. 27:17-22.) The Court recognizes that, though this was a *Terry* stop, which is a detention to which *Miranda* typically does not apply, Detective Manzo admitted that he continued attempting to have Defendant identify himself in order to determine whether Defendant was a felon and thus a felon prohibited from possessing a firearm. (Tr. 16:5-7, 27:17-22, 28:10-13.) The Court further acknowledges that, since Detective Manzo had knowledge that Defendant was in possession of the rifle, and since a felon being in possession of a firearm is a criminal offense under 18 U.S.C. §§ 922(g)(1) and 924(a)(8), Defendant's provision of an answer to Detective Manzo's continued questions attempting to ascertain his name would reveal whether he was a felon and whether he had violated these statutes and thus might be viewed as incriminating Defendant. However, this Court does not reach that conclusion.

Courts have held that in determining whether the background questions that typically fall within the booking exception are reasonably likely to elicit an incriminating response in a particular situation, "the officer's *actual* belief or intent is relevant, but it is not conclusive." *United States v. Doe*, 878 F.2d 1546, 1551 (1st Cir. 1989); *United States v. Booth*, 669 F.2d 1231, 1238 (9th Cir. 1981) ("The test is an objective one . . . and thus the subjective intent of the

12

police, while relevant, is not conclusive."). Courts have also held that "[t]he relationship of the question asked to the crime suspected is highly relevant" when making this determination. *United States v. Mata-Abundiz*, 717 F.2d 1277, 1280 (9th Cir. 1983) (finding that questioning conducted by an investigator was reasonably likely to elicit an incriminating response from a defendant because the background questions "related directly to an element of the crime" the investigator "had reason to suspect"); *see Booth*, 669 F.2d at 1238–39 (holding that asking a defendant his name, age, and residence did not constitute interrogation when the "routine, non-investigatory questions were totally unrelated to the crime").

Here, the question of Defendant's name did not relate directly to an element of felon in possession of a firearm. Though law enforcement would need to know a person's name in order to conduct a records check and determine whether that person has a previous felony conviction, the person's name, standing alone, is not determinative of whether that individual has a previous felony conviction. A situation in which asking an individual their name violates *Miranda* "would be a rare case indeed." *United States v. Reyes*, 225 F.3d 71, 77 (1st Cir. 2000) ("[A]sking a person's name might be reasonably expected to elicit an incriminating response if the individual were under arrest for impersonating a law enforcement officer or for some comparable offense focused on identity. . . ."). Though Detective Manzo's unequivocal intent in asking Defendant his name was to determine whether Defendant was a felon, this Court finds that such questioning was not the "functional equivalent" of a custodial interrogation, and the booking exception to *Miranda* applies.

Moreover, the motion before this Court is a motion to suppress the rifle, magazine, and ammunition, which were discovered as a result of a lawful seizure, independent of

13

Detective Manzo's subsequent questioning of Defendant without first giving him *Miranda* warnings. Therefore, the question of whether or not Detective Manzo violated *Miranda* is immaterial to the suppression of the rifle, magazine, and ammunition from evidence. Even if those items had been procured as a result of a response Defendant had given to one of Detective Manzo's inquiries, the Supreme Court and the Fourth Circuit have held that a violation of *Miranda* does not suppress physical or other derivative evidence discovered as a result of statements a suspect has provided without being given *Miranda* warnings. *See, e.g.*, *United States v. Patane*, 542 U.S. 630, 636–37 (2004) (a firearm that was recovered, as the "physical fruit" of a defendant's voluntary answer to a question about firearms before being given his *Miranda* rights, was still admissible); *United States v. Sterling*, 283 F.3d 216, 218–19 (4th Cir. 2002) (holding that the "fruit of the poisonous tree" doctrine was inapplicable to *Miranda* violations).

Therefore, even if there had been a *Miranda* violation, which the Court has not found, the rifle, magazine, and ammunition would not be suppressed. Accordingly, Defendant's Motion to Suppress will be denied.

For the reasons stated herein, the Court enters the following:

## ORDER

**IT IS THEREFORE ORDERED** that Defendant's Motion to Suppress, (ECF No. 13), is **DENIED**.

This, the 6th day of October 2023.

/s/Loretta C. Biggs
United States District Judge